1
2
3
4
5
6
7
8
9
10

**United States District Court**
**For the Northern District of California**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDWARD T. FURNACE,                     )     No. C 06-4229 MMC (PR)
                                       )
              Plaintiff,               )     **ORDER GRANTING  DEFENDANTS'**
                                       )     **MOTION FOR SUMMARY JUDGMENT**
       v.                              )
                                       )     **(Docket No. 52)**
M.S. EVANS, Warden, et al.,            )
                                       )
              Defendants.              )
_____)

On July 10, 2006, plaintiff, a California prisoner incarcerated at Salinas Valley State
Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action under
42 U.S.C. § 1983, alleging the violation of his constitutional rights by prison officials at
SVSP.  On January 15, 2008, the Court denied defendants' motion to dismiss the complaint
for failure to exhaust administrative remedies and ordered defendants to address, by way of a
dispositive motion, the allegations in plaintiff's second amended complaint ("SAC") and
supplemental complaint ("Suppl. Compl.").  In response, defendants have filed a motion for
summary judgment; plaintiff has filed opposition thereto, and defendants have filed a reply.
For the reasons stated below, the Court finds defendants are entitled to summary judgment on
all of plaintiff's claims.

**FACTUAL BACKGROUND**[1]

Plaintiff claims the violation of his First, Eighth and Fourteenth Amendment rights based on events that occurred between August 2005 and March 2007 in Facility C, a level IV maximum security housing unit at SVSP.  During the relevant time period, plaintiff was a level IV prisoner housed in Facility C and defendant G. Ponder ("Ponder") was the facility captain.  (SAC ¶ 5.)  Ponder's duties included "planning, organizing, and directing" programs for the "custody, security, discipline, classification, treatment, employment and recreation of inmates housed in Facility C."  (Decl. Def. Capt. Ponder Supp. Defs.' Mot. Summ. J. ("Ponder Decl.") ¶ 1.)  In particular, Ponder was responsible for designing and implementing the Facility C modified-program plan that plaintiff challenges in this action. (Id. ¶ 19, SAC ¶ 29.)

The other persons named as defendants are various prison officials, correctional officers and prison employees who, plaintiff maintains, were responsible for the violation of his constitutional rights during the time he was housed in Facility C in modified program status.[2]

A.    Modified Program For Facility C Inmates

Inmates are housed in Facility C for various reasons, including a history of assaultive behavior and disciplinary actions, gang-related convictions, and lengthy or life sentences. (Ponder Decl. ¶ 4.)  On July 14, 2005, in Facility C, an inmate using a homemade knife stabbed and almost killed two correctional officers.  (Id. ¶ 15.)  As a result of the incident,

---

[1]The facts set forth in the following section are undisputed; they are drawn from evidence submitted by plaintiff in support of the SAC and supplemental complaint, and the evidence submitted by the respective parties in support of and in opposition to the motion for summary judgment.  Additionally, plaintiff and defendants both have moved the Court, pursuant to Rule 201 of the Federal Rules of Evidence, to take judicial notice of certain documents submitted in support of their arguments.  Good cause appearing, the requests for judicial notice are GRANTED.  (Docket Nos. 45 (defendants' request) & 79 (plaintiff's request)).

[2]Those defendants are: SVSP Warden M. S. Evans, Deputy Warden A. Hedgpeth, lieutenant J. Ceyala, correctional sergeant M. Nilsson, correctional sergeant K. Nuckles, correctional officer D. Vega, correctional officer J. Rodriguez, appeals coordinator Variz, appeals coordinator Medina, and librarian S. McDonald.

United States District Court
For the Northern District of California

SVSP was placed on lockdown.  (Id.)  Facility C remained on lockdown until September 9, 2005, when it transitioned from lockdown to a "modified program."  (Id. ¶ 17.)

The procedures to be followed by prison officials during a lockdown or modified program are set forth in Department Operations Manual ("DOM") § 55015.  (Id. ¶ 6.)  In particular, § 55015 provides the authority to conduct inmate interviews and to suspend inmate privileges while the incident that led to the lockdown or modified program is being investigated.  (Id.)  Additionally, § 55015 provides the authority to discipline an inmate who refuses to participate in the interview process.  (Id.)

A total lockdown includes all inmates in an affected facility and remains in effect until searches and interviews of the entire affected facility are completed.  (Id. ¶ 7.)  A modified program includes all inmates from one or more specifically identified groups in the affected facility and remains in effect until searches and interviews of those identified groups have been completed.  (Id. ¶ 8.)  The primary objective of both a prison lockdown and modified program is to provide a secure and safe environment for both staff and inmates.  After the disturbance or emergency that led to the lockdown or modified program is isolated and contained, an investigation is conducted to collect evidence and gather information.  The investigation may involve: inmate interviews; searches of cells, common areas, yards, and buildings; monitoring of incoming and outgoing mail; and other means of collecting information.  At the conclusion of the investigation phase, the facility captain is responsible for formulating a plan to return the affected facility to a normal program.  (Id. ¶ 9.)

Inmates on a modified program face the following limitations: they are restricted to and fed in their cells; certain privileges or activities such as quarterly packages, visitations, and outdoor recreation are restricted, curtailed or modified; and their access to the canteen is limited to purchases for hygiene products.  (Id. ¶ 8.)  During the relevant period herein, the modified program in Facility C allowed non-contact visits only, inmates were moved from place to place within Facility C only with mechanical restraints applied, and legal materials were available to inmates only via the paging system, unless the inmate had a court deadline, which circumstance would allow him personal access to the law library.  (Id. ¶ 20.)

B.    <u>Plan to Return Facility C to Normal Program</u>

After Facility C went from lockdown to a modified program on September 9, 2005, captain Ponder formulated and implemented a plan to return Facility C inmates from a modified program to a normal program.  (<u>Id</u> ¶ 19.)  In that regard, Ponder, on October 17, 2005, sent a memorandum to Facility C inmates, updating them on the program status of Facility C and explaining what they would be required to do to be returned to a normal program.  The memorandum explained that the following steps were being taken in response to a history of ongoing violence in Facility C:

> Prior to the attempted murder of the two Correctional Officers, the facility was operating under four separate modified programs.  Over the last few years C Facility has operated on continuing modification due to the violence within the facility.  The motives of each disturbance have varied, however the singular driving force behind each incident has been level IV inmate's [sic] politics which are predominately gang related.  The inmate population succumbs to this peer pressure and condones this violence as acceptable in a level IV 180 general population setting.  The attitude and violence has continued over a substantial period of time.  During meetings with various inmates on the facility during classification and tours of the units, inmates repeatedly have confirmed this verbally as well as by their actions to staff.  This is unacceptable.  This jeopardizes the safety and welfare of every person who lives and works on the facility.

> Although incarcerated, each inmate is expected to be a law abiding citizen, the choice to program and rehabilitate oneself falls directly on each individual inmate.

> I am developing a process to help the facility work towards providing inmates that want to program without violence an opportunity to do so.  The choice to program will be in the hands of each individual inmate.  The first step in this process will be interviews.  The next step will be your commitment to program without violence and verification of this commitment by signing that fact.  The next process will involve Correctional Officers identifying inmates that have shown willingness to program and providing a list of those inmates to supervisory staff.

> Inmates that fail to act in accordance with Departmental rules and Institution procedures will result in housing and program changes.  Inmates are advised that their privileges and access to programs will be curtailed until you as an individual successfully comply with this process.

> In closing, your program is in your own hands.  Program is available to any and all general population inmates.  All you need is the willingness and commitment to program without violence.

(<u>Id.</u> ¶ 18 & Ex. D.)

Similarly, Ponder explained in a memorandum to defendant Evans, the warden of

SVSP, that the plan for returning inmates to a normal program included as an essential factor interviewing each inmate in order to gather intelligence and identify those inmates who were willing to program without violence.  (Id. ¶ 19 & Ex. E § 1.)  As part of the interview process, the inmate would be asked to sign a CDC-128-B "pledge"[3] as evidence of his willingness to follow the program without violence.  (Id. ¶ 11 & Ex. E § 2.)  The CDC-128-B pledge stated:

> I am currently housed within Facility 'C' Salinas Valley State Prison.  I am also aware that this facility is on modified program status based upon several acts of violence having occurred within the past 15 months.
>
> By signing this document, I am advising staff that I want to participate in the program review process being implemented at this time.  I am also stipulating that I want to "do my own time" and will program by not participating in gang violence.
>
> I have been advised that my failure to act in accordance with institutional rules and procedures may result in program and housing changes.  I am aware that during the time I participate in the program review process, I will retain my established work/privilege group.
>
> I am aware, if I am unassigned and I participate in the program review process that my participation does not constitute a credit earning assignment.  Further, I understand that my privileges and access to programs will be curtailed until I successfully complete this program and am returned to normal general population program status.
>
> I have been advised that the program review process is ongoing and that I will be expected to maintain compliance with regulations to participate.  During the program review process I will be required to interact with other inmates of all races and ethnicity during all out of cell activities.  The process and my participation in it, is on-going and monitered [sic].  During this period I understand that my progress and suitability to remain in the program will be monitored and evaluated by staff.

(Id. Ex. A.)

If an inmate signed the CDC-128-B pledge, and no factors evidencing a propensity for violence were found, the inmate would be returned to a normal program.  (Id. ¶ 11.)

Inmates who did not "meaningfully" participate in the interview process were

---

[3]"CDC-128-B" is the form number used by the California Department of Corrections and Rehabilitation ("CDCR") to identify departmental memoranda, but not the contents thereof.  Consequently, for the purpose of clarity, the Court refers to the CDC-128-B that is attached as Exhibit A to defendant Ponder's declaration, and constitutes the basis for much of the dispute herein, as the "CDC-128-B pledge."

identified either as failing to successfully complete the interview process or interviewing in

such a fashion that staff could not determine the threat posed by those inmates to other

inmates or staff.  (Id. ¶ 10.)  In particular, inmates who did not comply with the

interview/pledge requirement of the plan would be retained on a modified program and

placed at the bottom of the list for program review.  (Id. Ex. E §§ 2, 6.)

C.    Plaintiff's Retention on Modified Program Status

Following Ponder's implementation of the plan to return Facility C to a normal

program, plaintiff refused to participate in the interview process on fifteen different

occasions, specifically: November 9, 2005, January 30, 2006, May 3, 2006, May 21, 2006,

June 12, 2006, June 17, 2006, July 26, 2006, August 9, 2006, August 19, 2006, October 16,

2006, December 22, 2006, December 27, 2006, January 5, 2007, February 28, 2007, and

March 8, 2007.  (Id. ¶ 26.)  Consequently, plaintiff was retained on modified program status.

On March 22, 2007, plaintiff successfully completed the interview process and was

returned to a normal program.  (Id.)

**DISCUSSION**

A.    Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there

is "no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  See Fed. R. Civ. P. 56(c).  Material facts are those that may affect the

outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

dispute as to a material fact is genuine if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.  See id.

The court will grant summary judgment "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial . . . since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also

Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect

outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B.     Plaintiff's Claims

       1.     Retaliation

Plaintiff claims defendants placed and retained him on modified program status, denied him access to the courts, and deprived him of his personal property in retaliation for his exercising his First Amendment right not to comply with the interview/pledge requirement.

Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper. Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

7

First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005). Retaliatory motive may be shown by the timing of the alleged retaliatory act and inconsistency with previous actions, as well as direct evidence. See Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003). The prisoner must prove all the elements of a viable retaliation claim, including the absence of legitimate correctional goals for the conduct of which he complains. Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" Id. at 807 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Id. (quoting Sandin, 515 U.S. at 482).

a.    Placement and Retention on Modified Program Status

Plaintiff's first retaliation claim is that defendants placed and retained him on modified program status in retaliation for his refusal to comply with the interview/pledge requirement. Defendants argue that plaintiff's claim cannot succeed because plaintiff has not presented evidence that shows defendants' actions did not reasonably advance a legitimate correctional goal. Specifically, defendants argue, their decisions to place plaintiff on modified program status and require that he successfully complete the interview/pledge process before returning to a normal program were reasonably related to advancing the legitimate correctional goal of prison security.

It is undisputed that prison security is a legitimate correctional goal. See Turner v. Safley, 482 U.S. 78, 91 (1987); Mauro v. Arpaio, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc), cert. denied, 529 U.S. 1018 (2000) ("It is beyond question that both jail security and rehabilitation are legitimate penological interests."). Further, the Court finds, for the following reasons, that the undisputed evidence presented herein shows the interview/pledge

**United States District Court**
For the Northern District of California

1    requirement was reasonably related to advancing that goal.

2         As evidenced by the declaration of defendant Ponder, the modified program on

3    Facility C was implemented in response to the stabbing of two correctional officers on

4    July 14, 2005.  Thereafter, Ponder, in order to ensure the facility's gradual return to a secure

5    environment, used interviews to investigate the stabbing, as well as to identify inmates

6    showing a willingness to participate in normal programming without violence.  Additionally,

7    Ponder instituted the requirement that inmates sign the CDC-128-B pledge, based on his

8    belief that inmates who agreed to sign the pledge were signaling their willingness to program

9    positively and not engage in violence, as well as their willingness to participate in the

10   program-review process.  Inmates with unsuccessful interviews and those who refused to

11   sign the pledge were not considered eligible to return to a normal program because prison

12   officials either considered them a threat or could not assess what threat they posed to other

13   inmates or staff.  Nevertheless, such inmates were not retained indefinitely on a modified

14   program without further review.  Instead, they were given the ongoing opportunity to

15   participate in the interview/pledge process, as evidenced by the fact that plaintiff was asked,

16   but declined, to do so on fifteen different occasions between November 9, 2005 and March 8,

17   2007, and was returned to a normal program when he successfully completed the

18   interview/pledge process on March 22, 2007.

19        Further, the evidence shows that the interview/pledge requirement was not put in

20   place simply as a routine matter in a prison facility with no history of violence; rather, it was

21   a considered response to a history of violence at SVSP, and in particular in Facility C, that

22   had led to lockdowns and modified programming for a number of years.  In particular, the

23   July 14, 2005 stabbing incident was just the latest in a string of violent incidents that had

24   occurred in Facility C, and for more than a year thereafter prison officials in Facility C

25   continued to document threats and assaults that threatened the safety and security of the

26   institution and hindered the ability of staff to return Facility C to normal programming.

27        Additionally, Ponder's October 17, 2005 memorandum to Facility C inmates,

28   informing them what they needed to do to return to a normal program, reflects the belief of

**United States District Court**
For the Northern District of California

prison officials that the ongoing violence at SVSP was being tolerated by inmates due to gang politics and peer pressure within the inmate population. As a result, prison officials determined to endeavor to break that tolerance and, in so doing, the inmates' acceptance of prison violence. Consequently, the interview/pledge requirement advanced the goal of prison security by differentiating between those inmates who were willing to commit to programming non-violently and those who were not.

Although plaintiff claims that defendants placed and retained him on modified program status as punishment for his refusal to comply with the interview/pledge requirement, and not for the purpose of advancing legitimate penological objectives, he presents no evidence countering defendants' evidence that (1) the modified program was put into effect in response to a history of violence in Facility C; (2) the interview/pledge requirement was implemented as a security measure to assist prison officials in documenting and separating inmates who were willing to program without violence, (3) plaintiff was provided with ongoing opportunities to complete the interview/pledge process, and (3) he was returned to a normal program as soon as he did so.

Although, in evaluating a summary judgment motion, a court must draw all justifiable inferences in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. Beard v. Banks, 548 U.S. 521, 529-30 (2006). Here, the Court, giving due deference to the views of the SVSP prison officials, finds the decisions to implement a modified program in Facility C after the July 14, 2005 stabbing incident, and to require all inmates to successfully complete the interview/pledge process before being returned to a normal program, were reasonably related to the legitimate correctional goal of addressing the systemic problem of unsafe prison conditions in Facility C. Accordingly, as plaintiff has not presented evidence sufficient to create a triable issue of fact with respect to whether defendants retaliated against him when they placed and retained him on modified program status, defendants are entitled to summary judgment on this claim.

b.      Denial of Access to the Courts

Plaintiff claims defendant Ponder, Facility C librarian McDonald, and appeals coordinators Medina and Variz denied him access to the courts in retaliation for his refusal to comply with the interview/pledge requirement.

i.      Access to Law Library

Plaintiff claims that during the time plaintiff was on modified program status, defendant McDonald denied him access to the Facility C law library solely because plaintiff refused to comply with the interview/pledge requirement, thereby causing plaintiff to dismiss a civil action he had filed in the Superior Court of Monterey County ("Superior Court").

Prisoners have a constitutional right of access to the courts. Lewis v. Casey, 518 U.S. 343, 350 (1996). To establish a claim for any violation of the right of access to the courts, a prisoner must prove that there was an inadequacy in the prison's legal access program that caused him an actual injury. Id. at 350-55. To prove an actual injury, the prisoner must show that the inadequacy in the prison's program hindered his efforts to pursue a non-frivolous claim concerning his conviction or conditions of confinement. Id. at 354-55. The right of access to the courts is limited to the initiation of a court action; the state is not required to enable the prisoner to discover grievances or to litigate effectively once in court Id. at 354.

In support of his claim, plaintiff presents the following evidence: on October 5, 2005, plaintiff filed a request for physical access to the law library; on October 20, 2005, McDonald denied plaintiff's request; at some point thereafter, plaintiff filed his Superior Court action, Furnace v. Boucher, No. M77872, in which he was granted leave to proceed in forma pauperis on January 24, 2006; on February 9, 2006, plaintiff submitted a request for law library access because he had a "verified court deadline with the Monterey Superior Court"; on February 14, 2006, appeals coordinator Medina returned the appeal to plaintiff for the reason that it was incomplete; on September 29, 2006, plaintiff dismissed the Superior Court action. (SAC at ¶¶ 40-47, Exs. 4 & 5.)

Defendants argue plaintiff's evidence fails to create a triable issue of fact with respect

**United States District Court**
For the Northern District of California

1  to whether McDonald denied him access to the law library, because he refused to comply

2  with the interview/pledge requirement.  Specifically, defendants present evidence that during

3  the time plaintiff was on modified program status, prison regulations did not permit physical

4  access to the law library unless the prisoner had a verified court deadline within thirty days,

5  and that at the time plaintiff submitted his request to McDonald for law library access on

6  October 5, 2005, the only court deadline plaintiff had previously identified was for

7  December 12, 2005, a date substantially more than thirty days away.  Additionally,

8  defendants note that plaintiff had physical access to the law library on twenty different

9  occasions between February 7, 2006 and March 20, 2007.  Further, defendants argue,

10 plaintiff cannot show he was denied access to the courts by the dismissal of his Superior

11 Court action, because the evidence shows he voluntarily dismissed that action.  (Decl. Def. S.

12 McDonald Supp. Defs.' Mot. Summ. J. ("McDonald Decl.") ¶ 6; Defs.' Req. Jud. Not. Supp.

13 Defs.' Mot. Summ. J. Ex. B.)

14        Having reviewed the parties' arguments and supporting evidence, the Court finds

15 plaintiff has not presented evidence of facts sufficient to raise a genuine issue for trial as to

16 whether, as a result of a denial of access to the law library, he suffered an actual injury,

17 which injury, as noted, is an essential element of a claim for denial of access to the courts.  In

18 particular, it is undisputed that plaintiff was able to file his Superior Court action, which is all

19 that is required to satisfy the constitutional right of access to the courts.  See Lewis, 518 U.S.

20 at 354.  Further, it is undisputed that plaintiff voluntarily dismissed his Superior Court action

21 on September 29, 2006, and plaintiff has presented no evidence that shows such dismissal

22 was compelled by his lack of physical access to the law library.

23        As plaintiff has not presented evidence showing he was denied access to the courts by

24 defendant McDonald, plaintiff's claim that such asserted denial was in retaliation for his

25 refusal to comply with the interview/pledge requirement necessarily fails.  Accordingly,

26 summary judgment will be entered in favor of defendant McDonald on this claim.

27                    ii.    Administrative Appeals

28        Plaintiff claims he was denied his right of access to the courts when appeals

12

United States District Court
For the Northern District of California

1  coordinators Medina and Variz, in retaliation for plaintiff's refusal to comply with the

2  interview/pledge requirement, screened out, i.e., rejected for procedural reasons, seventeen of

3  plaintiff's administrative appeals.  (SAC ¶¶ 40-60, Exs. A-P).

4      Defendants argue plaintiff cannot prevail on his retaliation claim because he fails to

5  present evidence that creates a triable issue with respect to whether Medina and Variz

6  properly rejected each of the appeals and whether their actions adversely affected him.

7      As noted above, in order to prove a claim of retaliation under 42 U.S.C. § 1983, a

8  prisoner must show that a state actor took some adverse action against him because of that

9  prisoner's protected conduct.  See Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir.

10  2005).  Evidence of a retaliatory motive may be shown by direct evidence, as well as by the

11  timing of the allegedly retaliatory act and its inconsistency with previous actions.  See Bruce

12  v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

13      In the instant matter, plaintiff has not presented direct evidence of a retaliatory motive

14  for the rejection of his appeals by Medina and Variz.  Instead, he essentially argues that a

15  retaliatory motive can be inferred from the fact that Medina and Variz screened out the

16  appeals for reasons with which plaintiff disagrees.  Making a decision adverse to a prisoner,

17  however, is not inherently retaliatory, even if that decision is arguably incorrect.  Rather,

18  plaintiff must present evidence that defendants denied his appeals not for legitimate

19  penological reasons, but arbitrarily and because of plaintiff's assertion of his First

20  Amendment rights.  See Rizzo v. Dawson, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

21      Here, although plaintiff claims his appeals were wrongly screened out, he has not

22  presented evidence that shows Medina and Variz's actions were arbitrary and did not

23  advance the legitimate correctional goal of efficient administration of the administrative

24  appeals process.  In particular, having reviewed each of the screened-out appeals and

25  plaintiff's objections thereto, the Court finds the reasons cited by Medina and Variz for

26  rejecting the appeals are supported by the record and applicable prison regulations, and

27  plaintiff's stated disagreements with such reasoning are insufficient to establish that Medina

28

13

1   and Variz's actions were retaliatory.[4]

2        Additionally, while the timing of a defendant's actions may, in some instances,

3   provide circumstantial evidence of retaliatory intent, the times at which Medina and Variz

4   took the actions herein at issue do not support such an inference because those actions

5   constitute rulings which, irrespective of any result reached therein, were, as a matter of

6   undisputed fact, required to be made in response to plaintiff's administrative appeals, and the

7   timing thereof is prescribed by regulation.  See Cal. Code Regs., tit. 15 § 3084.6 (providing,

8   for each level of appeal, time within which response thereto shall be made).  Further,

9   plaintiff's evidence that only four appeals reached the Director's level of review during the

10  approximately eighteen-month period that plaintiff was on modified program status does not

11

12        [4]Specifically, the appeals were screened out for the following reasons:

13        Five appeals were screened out as incomplete.  The screen-out forms told plaintiff
    how to correct the deficiencies and return a completed appeal.  (Exs. 4, A, F, G, H.)

14  Although plaintiff argues the appeals were not incomplete, he presents no evidence that he
    either provided the requisite information with the original appeals or attempted to correct the

15  noted deficiencies.
        Five appeals were screened out because they raised issues that previously had been

16  decided adversely to plaintiff in Appeal No. 06-00015.  (Exs. B, I, K, M, N.)  In that appeal,
    which was denied at the Director's level of review on June 12, 2006, plaintiff claimed prison

17  officials retaliated against him for his refusal to comply with the interview/pledge
    requirement by placing him on modified program status and denying him certain privileges.

18  Plaintiff argues his subsequent appeals should not have been screened out because they
    involved events that took place after Appeal No. 06-00015 was decided.  The record shows,

19  however, that each of the screened-out appeals complained of ongoing deprivations due to
    plaintiff's continued retention on modified program status because of his refusal to comply

20  with the interview/pledge requirement, which was the precise claim at issue in Appeal No.
    06-00015.

21        Four appeals were screened out as duplicative of prior appeals.  (Exs. C, D, J, L.)
    Plaintiff makes the conclusory assertion that the appeals were not duplicative, but presents no

22  evidence of the prior appeals for comparative purposes.  Similarly, plaintiff objects that one
    appeal was improperly screened out for the reason plaintiff "refus[ed] to cooperate" (Ex. P),

23  but he presents no evidence to substantiate his objection.
        One appeal was screened out for the reason that factual findings made at a prior level

24  of administrative review showed plaintiff had provided false information to support his
    claim.  (Ex. E.)  Although plaintiff argues the appeal should not have been rejected based on

25  the earlier decision, he presents no evidence that shows the findings were unfounded.
        Finally, one of plaintiff's appeals was screened out for the reason that plaintiff had

26  misquoted the applicable prison regulation.  (Ex. 6.)  As the appeal was both filed and
    screened out approximately one month before the interview/pledge requirement went into

27  effect, however, the rejection of the appeal cannot have been in retaliation for plaintiff's
    refusal to comply with the interview/pledge requirement.

28

1    lead to an inference of retaliatory motive because the same evidence  shows that only four

2    appeals reached the Director's level of review during the approximately eighteen-month

3    period before plaintiff was placed on modified program status.  (See Pl.'s Decl. Supp. Opp.

4    ¶¶ 9-10 & Ex. C  (Grannis Decl. and log).)

5           Finally, the fact that Medina and Variz screened out plaintiff's appeals during the

6    period he was on modified program status is not indicative of a retaliatory motive where, as

7    here, plaintiff has not presented evidence indicating their actions were inconsistent with

8    actions they took before plaintiff refused to comply with the interview/pledge requirement.

9    Indeed, plaintiff's evidence shows that Medina and Variz regularly screened out plaintiff's

10   appeals before the interview/pledge requirement went into effect, while the interview/pledge

11   requirement was in effect and plaintiff was refusing to comply with that requirement, and

12   also after plaintiff successfully complied with the interview/pledge requirement.  (See id. and

13   Suppl. Compl. Ex. 013.)

14          For the reasons stated above, the Court finds plaintiff has failed to present evidence

15   sufficient to raise a triable issue with respect to whether defendants Medina and Variz denied

16   plaintiff's administrative appeals in retaliation for plaintiff's refusal to comply with the

17   interview/pledge requirement.  Accordingly, defendants are entitled to summary judgment on

18   this claim.

19                         c.    Deprivation of Personal Property

20          Plaintiff claims he was denied access to his personal property in retaliation for his

21   refusal to comply with the interview/pledge requirement.

22                         i.    Defendants Vega and Nilsson

23          In support of his claim, plaintiff presents the following evidence: On November 16,

24   2005, defendant Vega denied plaintiff his personal property for the reason that plaintiff was

25   refusing to participate in the interview/pledge process.  On January 9, 2006, Vega issued

26   plaintiff's property to him.  (SAC ¶¶ 67-68 & Ex. 11.)  On February 4, 2006, defendant

27   Nilsson ordered Facility C property officers not to issue plaintiff his special purchase order

28   package because plaintiff had not complied with the interview/pledge requirement.  On

March 21, 2006, Nilsson issued plaintiff's property to him.  (SAC ¶¶ 70-76 & Ex. 12.)

Defendants argue plaintiff's evidence fails to establish that Vega and Nilsson retaliated against him, because the temporary deprivation of plaintiff's property was justified by his modified program status, during which the delivery of quarterly and special purchase order packages may be restricted.  (Ponder Decl. ¶ 8.)  Further, defendants argue, plaintiff was not adversely affected by the temporary deprivation, because the evidence shows he eventually received his property in both instances.

The Court agrees that plaintiff has failed to present evidence sufficient to create a triable issue with respect to whether defendants Vega and Nilsson retaliated against him by temporarily depriving him of his personal property because he failed to comply with the interview/pledge requirement.  The Court already has found, the retention on modified program status of inmates who refused to comply with the interview/pledge requirement, under the circumstances at issue herein, reasonably advanced the legitimate correctional goal of prison security.  Further, it is undisputed that the temporary denial of plaintiff's personal property was a condition of his placement on modified program status.

In sum, plaintiff has failed to present evidence sufficient to support his claim that he was denied access to his property by Vega and Nilsson as a retaliatory measure, and, accordingly, Vega and Nilsson are entitled to summary judgment on such claim.

ii.  <u>Defendant Rodriguez</u>

Plaintiff further claims he was subjected to retaliation by defendant Rodriguez who, upon transferring plaintiff to the Behavioral Modification Unit ("BMU") on March 10, 2006, took plaintiff's property and only returned part of it to him on March 17, 2006.  (SAC ¶¶ 80-82.)  To support his claim, plaintiff has presented evidence of an Inmate Property Inventory sheet ("property sheet") documenting the items that were in his cell before he was moved to the BMU, and a purchase order listing all of the items plaintiff claims were not returned to him, specifically: one pair of headphones, one extension cord, one CD cleaning system, one extension cord kit, and papers and documents to be used as exhibits in the instant action.  (<u>Id.</u> Exs. 13, 14.)

1   Defendants argue plaintiff's retaliation claim is without merit because plaintiff's own
2   evidence shows Rodriguez never took the above-referenced property items.  Specifically, the
3   property sheet, which documents all of the property that was in plaintiff's cell before he was
4   moved to the BMU, was signed by plaintiff on March 10, 2006, below a line that reads: "The
5   above listed items constitute all of my personal property which I am authorized to retain."
6   (SAC Ex. 13.)  None of the items plaintiff claims were missing on March 17, 2006 is listed
7   on the property sheet.  (Id.)  Further, the purchase order, which is offered to document
8   plaintiff's purchase of the alleged missing items, is dated November 28, 2003, and does not
9   suffice to establish such items were in plaintiff's possession at the time he was moved to the
10  BMU on March 10, 2006.

11  Accordingly, as plaintiff has failed to present evidence sufficient to show Rodriguez
12  permanently deprived him of any property, Rodriguez is entitled to summary judgment on
13  plaintiff's retaliation claim.

14  2.   Unconstitutional Conditions of Confinement

15  Plaintiff claims his retention on modified program status resulted in his being denied
16  contact visits with his family, access to his property, and outdoor exercise, all in violation of
17  his rights under the Eighth Amendment.  (SAC ¶ 89-112, 160.)

18  The Constitution does not mandate comfortable prisons, but neither does it permit
19  inhumane ones.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The treatment a prisoner
20  receives in prison and the conditions under which he is confined are subject to scrutiny under
21  the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 31 (1993).  A prison official
22  violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged
23  is, objectively, sufficiently serious, and (2) the prison official possesses a sufficiently
24  culpable state of mind.  Farmer, 511 U.S. at 834.

25  a.   Contact Visits

26  Plaintiff asserts the denial of contact visits with his family while he was on a modified
27  program violated the Eighth Amendment.  Defendants argue plaintiff's claim fails as a matter
28  of law because there is no constitutional right to contact visits.  The Court agrees.  Prisoners

17

1    have no constitutional right to contact visitation.  Gerber v. Hickman, 291 F.3d 617, 621 (9th

2    Cir. 2002).  Consequently, the denial of contact visits does not violate the Eighth

3    Amendment.  Toussaint v. McCarthy, 801 F.2d 1080, 1113-14 (9th Cir. 1986).  Accordingly,

4    defendants are entitled to summary judgment on this claim.[5]

5                              b.    Property

6          Plaintiff claims the denial of access to his personal property and certain canteen items

7    while he was on a modified program violated the Eighth Amendment.  Defendants argue

8    plaintiff's claim is without merit because the deprivation of personal property does not

9    constitute cruel and unusual punishment in violation of the Eighth Amendment.  Further,

10   defendants argue, there is no constitutional right to purchase canteen items and, in any event,

11   plaintiff was allowed to purchase some canteen items, specifically, hygiene products.

12         Plaintiff cannot prevail on his Eighth Amendment claim because he has not presented

13   evidence that a sufficiently serious deprivation resulted from the denial of his personal

14   property.  Specifically, he has neither identified what property items he was denied nor the

15   harm that resulted from such denial.  Additionally, plaintiff's claim that he was denied

16   certain canteen items fails as a matter of law.  See Keenan v. Hall, 83 F.3d 1083, 1092 (9th

17   Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (holding there is no constitutional right

18   to canteen items).  Accordingly, summary judgment will be granted in favor of defendants on

19   this claim.

20                             c.    Exercise

21         Plaintiff claims the denial of access to outdoor exercise while he was on modified

22   program status violated the Eighth Amendment.  Defendants argue plaintiff's claim is

23   without merit because he has not presented evidence that creates a triable issue with respect

24   to whether defendants subjectively acted with deliberate indifference.

25

26         [5]In his opposition, plaintiff argues the denial of contact visits was in retaliation for his
     refusal to comply with the interview/pledge requirement.  It is undisputed, however, that the
27   denial of contact visits was a condition of plaintiff's placement on modified program status.
     As the Court has found plaintiff's placement on modified program status was not retaliatory,
28   his assertion that the denial of contact visits was retaliatory is without merit.

A prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for criminal recklessness is met, i.e., the official knew of and disregarded an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837.  The official must both have been aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must have drawn the inference.  See id.  Prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.  Id. at 844.  Further, prison officials can prove they were unaware even of an obvious risk to inmate health or safety by showing "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Id.

Additionally, prison officials who actually knew of a substantial risk to inmate health or safety may be found not to have acted with deliberate indifference if they responded reasonably to the risk, even if the harm ultimately was not averted.  Id.  "A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions."  Id. at 844-45 (internal quotations and citations omitted).  Thus, prison officials who act reasonably cannot be found liable for an Eighth Amendment violation.  Id. at 845.

Here, defendants first argue plaintiff cannot show they knew of and disregarded an excessive risk to plaintiff's health and safety by denying him outdoor exercise, because defendants believed plaintiff could have availed himself of exercise at any time by complying with the interview/pledge requirement, and his refusal to do so on numerous occasions indicated he was not suffering serious harm from the deprivation.  (Ponder Decl. ¶¶ 9, 11, 21, 26.)  In response, plaintiff asserts that defendants' actions were not rationally related to legitimate penological objectives and go "against the spirit and intent of the federal constitution."  (Opp. at 15-16.)  Plaintiff, however, has not produced evidence showing that, other than prison officials' awareness of plaintiff's general objection to the denial of exercise,

United States District Court
For the Northern District of California

1  those officials had reason to believe plaintiff faced a substantial danger to his health from

2  lack of exercise.  Consequently, although prison officials knew plaintiff was being denied

3  access to outdoor exercise because of his refusal to comply with the interview/pledge

4  requirement, the undisputed evidence shows they believed the risk of harm to plaintiff was

5  "insubstantial or nonexistent," Farmer, 511 at 844, because plaintiff had it within his power

6  to gain immediate access to outdoor exercise.

7       Defendants further argue they did not act with deliberate indifference because they

8  acted reasonably by denying plaintiff access to exercise based on legitimate security concerns

9  in Facility C.  The Ninth Circuit recently clarified that a prisoner's right to outdoor exercise

10  is not absolute; when there are substantial reasons for imposing a lockdown and confining

11  prisoners to their cells, prison officials must be afforded "wide-ranging deference" when

12  "balancing the obligation to provide for inmate and staff safety against the duty to accord

13  inmates the rights and privileges to which they are entitled . . . ."  Norwood v. Vance, 572

14  F.3d 626, 631-32 (9th Cir. 2009); see LeMaire v. Maass, 12 F.3d 1444, 1458 (9th Cir. 1993)

15  (upholding long-term denial of outdoor exercise to prisoner who represented "grave security

16  risk" because of history of extensive serious misconduct); Hayward v. Procunier, 629 F.2d

17  599, 603 (9th Cir. 1980) (upholding five-month deprivation of outdoor exercise following

18  lockdown initiated in response to "genuine emergency"), cert. denied, 451 U.S. 937 (1981).

19       Here, as discussed above, defendants have produced uncontradicted evidence that the

20  placement and retention of plaintiff on modified program status, including the restriction of

21  privileges concomitant with such placement, was reasonably related to legitimate penological

22  concerns.  Specifically, defendants' evidence shows the following: Facility C was placed on

23  lockdown and thereafter a modified program was adopted for security reasons following the

24  stabbing of two correctional officers; there was a reasonable relationship between requiring

25  inmates to comply with the interview/pledge requirement and restoring institutional security;

26  plaintiff repeatedly refused to comply with the interview/pledge requirement; and, because of

27  plaintiff's refusal, defendants were unable to assess the level of threat plaintiff posed to staff

28  and other inmates should he be returned to a normal program.  Further, it is undisputed that

United States District Court
For the Northern District of California

1  for a period of seventeen months following the July 14, 2005 stabbing incident, through

2  December 12, 2006, there were several other documented threats and assaults that took place

3  in Facility C that threatened the safety and security of the institution and hindered the ability

4  of staff to return Facility C to normal programming.

5          When restricting exercise privileges of inmates who pose security concerns, "prison

6  officials are authorized and indeed required to take appropriate measures to maintain prison

7  order and discipline and protect staff and other prisoners . . . ." LeMaire, 12 F.3d at 1458.

8  For the reasons discussed above, the Court finds plaintiff has failed to create a triable issue

9  with respect to whether defendants subjectively acted with deliberate indifference when they

10  denied plaintiff access to outdoor exercise while he was on modified program status.

11  Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment

12  exercise claim.

13          3.    Equal Protection

14          Plaintiff claims his right to equal protection under the Fourteenth Amendment was

15  violated when prison officials treated him differently than similarly situated inmates by

16  retaining him on modified program status when he refused to comply with the

17  interview/pledge requirement.  (SAC ¶¶ 115-17.)

18          "The Equal Protection Clause of the Fourteenth Amendment commands that no State

19  shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

20  essentially a direction that all persons similarly situated should be treated alike." City of

21  Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Where a prisoner claims his

22  right to equal protection has been violated, the proper question for this Court's determination

23  is that set forth in Turner v. Safley, 482 U.S. 78 (1987), specifically, whether the regulation

24  or practice claimed to violate the prisoner's right to equal protection is reasonably related to

25  legitimate penological interests.  See Washington v. Harper, 494 U.S. 210, 223-25 (1990).

26  To succeed on an equal protection claim, a prisoner must show that officials intentionally

27  acted in a discriminatory manner.  More v. Farrier, 984 F.2d 269, 271-72 (8th Cir. 1993)

28  (holding federal courts, absent evidence of invidious discrimination, should defer to

1    judgment of prison officials).

2    Thus, to defeat summary judgment on his equal protection claim, plaintiff must set

3    forth specific facts showing there is a triable issue as to whether (1) he was treated differently

4    from similarly situated inmates; (2) such unequal treatment was not reasonably related to a

5    legitimate penological objective; and (3) such unequal treatment was the result of invidious

6    discrimination against plaintiff.

7    Plaintiff asserts he was treated differently from similarly situated inmates in his prison

8    work group who, like plaintiff, were not responsible for the stabbing incident that occurred

9    on July 14, 2005, and were allowed to return to normal programming.  In response,

10   defendants argue plaintiff's equal protection claim fails because he has not presented

11   evidence that he was similarly situated to other inmates who were returned to a normal

12   program after they interviewed and signed the CDC 128-B- pledge.

13   The Court agrees that plaintiff has not created a triable issue with respect to whether

14   he was treated differently from similarly situated inmates, because plaintiff has not shown

15   that other inmates in his work group who were not responsible for the stabbing incident *and*

16   refused to comply with the interview/pledge requirement were allowed to return to a normal

17   program.  Further, as discussed above, the interview/pledge requirement was reasonably

18   related to legitimate penological objectives, and plaintiff has presented no evidence of

19   invidious discrimination.   Accordingly, defendants are entitled to summary judgment on

20   plaintiff's equal protection claim.

21          4.    Due Process

22   Plaintiff's final claim is that prison officials, in violation of due process, failed to

23   provide him with a hearing when deciding to place and retain him on modified program

24   status.

25   The protections of procedural due process do not apply when prison officials place

26   prisoners on lockdown status in response to a genuine emergency.  Hayward, 629 F.2d at

27   602-03.  In particular, under such circumstances, prisoners are not entitled to a hearing either

28   at the time prison officials make the initial determination to implement a lockdown or at such

United States District Court
For the Northern District of California

1    time as they determine whether the degree of emergency justifies a continuation of the

2    lockdown.  Id. at 602.  The determination by prison officials that conditions exist sufficient to

3    warrant implementation  or continuation of a lockdown must be accorded considerable

4    deference by the court.  See id.

5         Here, defendants argue, plaintiff cannot prevail on his due process claim because he

6    has not presented sufficient evidence to create a triable issue with respect to whether he was

7    placed and retained on modified program status in response to a genuine emergency.[6]  In

8    support of their argument, defendants present evidence of the following general procedures

9    used by prison officials to decide whether a modified program should be implemented:

10   (1) the procedures followed by prison officials during a lockdown or a modified program are

11   set forth in DOM § 55015; (2) lockdowns and modified programs are implemented by prison

12   officials in response to a prison disturbance or emergency; (3) a lockdown applies to all

13   inmates in a facility, while a modified program applies to all inmates from one or more

14   specifically identified groups in an affected facility; (4) the primary objective of both a

15   lockdown and modified program is to provide a secure and safe environment for both staff

16   and inmates; (5) after the disturbance or emergency that led to the lockdown or modified

17   program is isolated and contained, an investigation is conducted to collect evidence and

18   gather information; and (6) when a modified program has been implemented, the modified

19   program remains in effect until searches and interviews of the identified groups have been

20   completed.  (Ponder Decl. ¶¶ 6-8.)

21        Additionally, with respect to implementation of the modified program herein,

22   defendants present evidence that the modified program was justified by the genuine

23   emergency caused by the July 14, 2005 stabbing incident as well as by the ongoing violence

24   in Facility C, both before and after the stabbing incident, and that the interview/pledge

25   requirement, which asked inmates to commit to programming non-violently before being

26

27        [6]In Hayward, the court defined a lockdown as "a condition of abnormally heightened
     security during which prisoners are confined to their cells totally or for a much greater
28   portion of the day than usual."  Id. at 600 n.1.  Here, the evidence is undisputed that a
     modified program is a type of lockdown.

23

United States District Court
For the Northern District of California

1  returned to a normal program, was justified by evidence that the violence was being tolerated

2  by inmates due to gang politics and peer pressure within the inmate population. (Id. ¶ 5, 11,

3  18-19, 23-25.)[7]

4          In opposition to defendants' argument, plaintiff does not contend the modified

5  program should not have been implemented in the first instance. Rather, he argues he should

6  not have been retained on modified program status, either after January 23, 2006, because the

7  evidence shows the investigation into the July 14, 2005 stabbing incident was concluded on

8  that date, or after March 1, 2006, because the evidence shows such date is the date by which

9  the majority of inmates had been returned to a normal program.

10         The Court finds plaintiff's evidence fails to create a triable issue with respect to

11  whether prison officials reasonably determined that the conditions in Facility C warranted the

12  implementation and continuation of a modified program. Consequently, according deference

13  to the decision of prison officials with respect to the degree of the ongoing emergency

14  conditions in Facility C, the Court finds plaintiff was not entitled to a hearing with respect to

15  his placement and continued retention on modified program status. See Hayward, 602.

16         Accordingly, for the reasons stated above, defendants are entitled to summary

17  judgment on plaintiff's due process claim.[8]

18                                    **CONCLUSION**

19         For the foregoing reasons, defendants' motion for summary judgment is hereby

20  GRANTED and judgment shall be entered in favor of each of the defendants.

21  _____

22         [7]Specifically, defendants present undisputed evidence of the following incidents that
   occurred in Facility C after the modified program was implemented: on February 24, 2006,
23  an inmate was attacked and seriously injured; on April 26, 2006, a potential threat to staff
   was discovered; on April 27, 2006, there was an inmate riot; on December 12, 2006,
24  information was received that certain inmates were conspiring to assault correctional staff.
   Further, between January 2005 and April 2006, more than 170 violent acts were committed
25  by inmates in Facility C. (Id. ¶¶ 5, 23-25.)

26         [8]In light of the Court's determination that defendants did not violate plaintiff's
   constitutional rights under the First, Eighth and Fourteenth Amendments, the Court does not
27  reach defendants' argument that they are entitled to qualified immunity on plaintiff's claims.
   Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been
28  violated were the allegations established, there is no necessity for further inquiries
   concerning qualified immunity.")

1      This order terminates Docket No. 52.

2      The Clerk shall close the file.

3      IT IS SO ORDERED.

4  DATED: August 14, 2009

5                                              _____
                                               MAXINE M. CHESNEY
6                                              United States District Judge